**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JOHN W.,[1]

                              Plaintiff,                  5:20-cv-01180 (BKS)

v.

KILOLO KIJAKAZI,[2] Acting Commissioner of Social
Security,

                              Defendant.

---

**Appearances:**

*For Plaintiff:*
Howard D. Olinsky
Olinsky Law Group
250 South Clinton St., Ste. 210
Syracuse, NY 13202

*For Defendant:*
Carla B. Freedman
United States Attorney
Nicole Sonia
Special Assistant United States Attorney
Social Security Administration
JFK Federal Bldg., Room 625
15 New Sudbury St.
Boston, MA 02203

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect his privacy.

[2] Pursuant to Fed. R. Civ. P. 25(d), the current Acting Commissioner of Social Security, Kilolo Kijakazi, has been substituted in place of her predecessor, Commissioner Andrew Saul.

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff John W. filed this action under 42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits. (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 15, 20). After carefully reviewing the Administrative Record,[3] and considering the parties' arguments, the Court affirms the Commissioner's decision.

## II.     BACKGROUND

### A.      Procedural History

Plaintiff applied for SSDI and SSI on April 26, 2017 (R. 10, 102); he alleged disability due to sciatic nerve pain, lower back arthritis, chronic obstructive pulmonary disease ("COPD"), Diabetes II, depression, and anxiety. (R. 13, 304). Plaintiff originally alleged a disability onset date of March 5, 2016.[4] (R. 10, 267). The Social Security Administration denied his claim on August 1, 2017, (R. 132), and Plaintiff requested a hearing on August 31, 2017, (R. 146). Administrative Law Judge ("ALJ") Elizabeth Koennecke held a hearing on May 6, 2019, (R. 37), during which Plaintiff amended the alleged disability onset date to April 30, 2017,[5] (R. 42), and

---

[3] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 12), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

[4] Plaintiff had a prior application for SSD, which was denied after a hearing on March 4, 2016. (R. 300).

[5] Plaintiff amended his disability onset date to correspond to his 50th birthday. (R. 41–42). The Medical-Vocational Guidelines indicate that if an individual "approaching advanced age" (age 50–54) is limited to sedentary work, with no transferable skills from vocationally relevant past work, a finding of disability "ordinarily obtains." 20 C.F.R. Pt. 404, Subpt. P, App'x. 2, § 201.00(g).

a subsequent hearing on October 2, 2019, (R. 57), and, following this hearing, denied his claim

on October 9, 2019, (R. 7). Plaintiff appealed that determination, and on July 25, 2020 the

Appeals Council denied the request for review of the ALJ's decision. (R. 1–6). Plaintiff

commenced this action on September 25, 2020. (Dkt. No. 1).

**B.      Plaintiff's Background and Testimony**

Plaintiff was 52 years old at the time of his May 6, 2019 hearing. (R. 42). He has a high

school education. (R. 41). He is single with no children and lives alone in an apartment. (R. 43).

Plaintiff has worked as a front desk operator at a bowling alley, a janitor, a loader/package

handler at a package delivery service, and as a parking lot cleaner at a strip mall. (R. 306). He

stopped working in February 2013 when he was let go from his job as a warehouse worker at

UPS, a job he held for over 25 years. (R. 304, 439, 957, 1141).[6]

Plaintiff testified that he has "back issues," specifically "sciatica nerve pain." (R. 43). He

has achy and throbbing pain in his lower back every day. (R. 43–44). Sometimes he experiences

pain in his side that radiates down his left leg, which can be "very, very painful." (R. 44). He

takes prescription medications in the morning and at night for his pain, which "gives him relief,"

depending on how bad the pain is. (R. 48–49). Nerve block injections in his back have provided

"a little bit of relief." (R. 49). Because of his COPD, Plaintiff experiences shortness of breath

when he moves; constant movement requires him to "stop and take a break." (R. 44). He uses an

inhaler daily, as prescribed, but does not have a rescue inhaler. (R. 44–45). Plaintiff also has

diabetes, which causes throbbing pain in his foot every two to three days. (R. 45).

---

[6] During a consultative examination Plaintiff reported that at the time he stopped working he was "having problems with substance abuse." (R. 1141). Plaintiff appears to have previously reported that he was "forced to retire" from UPS "due to drugs and alcohol problems, and back pain." (R. 439).

Plaintiff testified to having some physical limitations because of these health problems. He can "maybe" get his housework done in one day but has to take his time. (R. 45–46). Chores such as "scrubbing the walls" are hard for him to do. (R. 46). If he spends all day cleaning, he must stop to rest every half hour for fifteen to twenty minutes. (*Id.*). Rest and laying down generally help Plaintiff's back pain, unless his back "really, really hurts," in which case laying down can be uncomfortable. (*Id.*). Plaintiff can stand for "maybe a half hour at one time." (R. 47). He can sit but must get up after an hour to stretch and adjust. (*Id.*). Plaintiff tires easily when walking and his back and sciatic nerve pain hurt after a half hour. (*Id.*). Going up and down stairs hurts if he is "doing it for a long period of time." (R. 50). Plaintiff can lift and carry "hardly any weight at all"—only ten pounds if it is "an all-day thing." (R. 47–48). Bending to pick things up "hurts a lot," mainly in his back. (R. 48).

Plaintiff is able to dress himself, but does so in a manner that is "more comfortable" for him, and it hurts to bend over to put on socks. (*Id.*). He does his "main" grocery shopping once each month but goes to the store weekly for bread or milk. (R. 49–50). At the grocery store, he gets a cart, walks down the aisles "very slowly," just gets what he needs, and then goes home. (R. 49).

Plaintiff receives psychological treatment for depression and anxiety. (R. 50–51). He meets with a therapist every two weeks. (R. 51). He does not feel completely depressed every day, but often wishes things were better for him. (*Id.*). He has "bad days" a couple of times a week during which he has problems with motivation. (R. 51–52). On a "really bad day" he just wants to be left alone and "watch TV or something." (R. 52). On a good day, he can be in a good mood and be more social. (*Id.*). He has anxiety every day. (*Id.*). He does not like being in a big crowd and feels that "he doesn't belong" due to his appearance. (R. 54). If he is in a large group,

Plaintiff does not really talk, especially if there are strangers. (*Id.*). He has trouble concentrating and focusing, and it "seems like [his] head is somewhere else" a lot, thinking about other things that are going on. (*Id.*). Plaintiff finds it "hard to get motivated" to complete paperwork. (*Id.*).

Plaintiff testified that he currently works around five hours a week as a paid volunteer at an organization called Peace. (R. 52–53). He works at the desk answering phones, making copies, and sending faxes. (R. 53). Because the job is "mainly volunteer," he can come and go as he pleases. (*Id.*).

### C.    Medical Evidence[7]

#### 1.    Treatment Records

##### a.    Northway Medical Associates

Plaintiff has received primary care at Northway Medical Associates, PLLC since 2015. (*See* R. 497). On June 9, 2017, Plaintiff saw Brittany J. Miller, PA. (R. 504, 507). He indicated that sciatic nerve pain was "bothering him" and was "really starting to effect [h]is daily living." (R. 504). Plaintiff told PA Miller that he had received a nerve block, but that it had only helped for a few days. (*Id.*). He reported that he had been clean from drugs and alcohol for one year, and that his depression was "okay," but that he "hates everything," his life "doesn't seem fun anymore," he is "not very motivated to do things," and he is "alone a lot." (*Id.*). He reported going to counseling, and denied thoughts of suicide, although he gets anxiety "often." (*Id.*). He told PA Miller that he had been volunteering at "Peace," and that he found "joy in doing that." (*Id.*). His breathing was "under control" although he gets short of breath with exertion. (*Id.*). When Plaintiff saw PA Miller on August 11, 2017, his report regarding sciatic nerve pain was

---

[7] The Court has only recounted medical evidence in the Administrative Record that is within the Plaintiff's alleged period of disability and relevant to the issues in this case.

much the same. (R. 633, 637). PA Miller noted that Plaintiff's A1C had "significantly increased" and changed his diabetes medication. (R. 637).

On September 28, 2017, Plaintiff saw Dr. Rajeev Saini, MD and reported having "some exacerbation of his pain," although Dr. Saini noted that Plaintiff did "not appear to be too uncomfortable." (R. 628, 632). Upon examination, Dr. Saini noted "harsh breath sounds" in Plaintiff's lungs, that he had "some discomfort of the lower back," and that his "straight leg raise test [was] fine to 60 [degrees] on the left and 70 on the right" with "no loss of reflexes." (R. 629). Dr. Saini observed that Plaintiff's "diabetes is doing poorly" and instructed Plaintiff "to take his medications the right way" and "to check his sugars." (R. 632).

On November 27, 2017, Plaintiff told PA Miller that his sciatic nerve pain continued, (R. 1123, 1127), that physical therapy had not provided relief, and that he was taking muscle relaxers as needed. (R. 1123). PA Miller noted that Plaintiff's reports regarding depression, anxiety, sobriety, and COPD were unchanged, (id.), and that his A1C had "improved," (R. 1127).

On January 25, 2018, Plaintiff saw Dr. Saini and reported exacerbation of his back pain; Dr. Saini observed that Plaintiff did "not appear to be too uncomfortable." (R. 1118, 1122). Dr. Saini noted that Plaintiff's diabetes was "not doing too good," he was "not very compliant with his medications," and he was not using his CPAP machine. (R. 1118). The results of his physical examination were the same as the September 28, 2017 physical examination. (R. 629, 1120). Plaintiff had a chest x-ray on February 15, 2018, which showed that his lungs were clear. (R. 1112).

Plaintiff saw PA Miller on February 26, 2018 and April 30, 2018 and reported that his sciatic pain was "better." (R. 1102, 1106, 1108, 1111). PA Miller noted that Plaintiff's diabetes was "not well controlled." (R. 1106, 1111). On July 3, 2018, Plaintiff told PA Miller that his

depression was "okay," and that he had moved into a new apartment and enjoyed "being around more people." (R. 1098, 1101). PA Miller increased his Zoloft dosage. (R. 1101). On September 4, 2018, Plaintiff's diabetes was still not well controlled, but on December 10, 2018, PA Miller noted his diabetes was "much better" and his COPD was well controlled. (R. 1087, 1090, 1095–96). At appointments on February 11, 2019 and April 16, 2019, PA Miller noted that Plaintiff was "doing well," his "diabetes is well controlled" and his "depression is okay." (R. 1080, 1082, 1085).

On June 17, 2019 and August 20, 2019, Plaintiff met with Brittany J. Todd, PA, who noted that Plaintiff reported that he had not been feeling like himself, and had been feeling lightheaded and weak since a cardiac procedure.[8] (R. 1304, 1309). Plaintiff reported that his sciatic pain and depression were "better." (*Id.*). He was still smoking and had stopped taking Chantix. (R. 1304). Overall, he was noted to be "doing well": his diabetes was well-controlled, his blood pressure "could be better," and his depression was "okay." (R. 1308, 1312).

Plaintiff's physical examinations at Northway Medical Associates were frequently normal, including his neurological and psychological examinations. (R. 435, 1078, 1084, 1089, 1093, 1100, 1104, 1110, 1125, 1306–07, 1311–12).

### b.    Psychological HealthCare, PLLC

Plaintiff has attended psychotherapy with Robert J. Foresti, LCSW-R, a social worker at Psychological HealthCare, PLLC, since 2015. (R. 298–99). At his initial intake, Plaintiff was diagnosed with Depressive Disorder. (R. 442–43). On April 7, May 17, and May 31, 2017, Plaintiff's depression was 4/10, with depressed mood, low self-esteem, anhedonia, and

---

[8] On May 16, 2019, Plaintiff was admitted to Crouse Hospital following a nuclear stress test revealing a "large area of infarction and peri-infarct ischemia in the interior wall." (R. 1155, 1190, 1223). While in the hospital, he received a cardiac catheterization, angioplasty, and three stents to RCA, and underwent a percutaneous intervention to the right coronary artery. (R. 1156, 1190). Plaintiff's cardiac issues are not at issue in this case.

dysphoria. (R. 468, 470, 472). Throughout this period, his anxiety ranged from 3/10 to 5/10, with anxious feelings and fear. (*Id.*). He had no intensification of symptoms. (R. 469, 471, 473). He had an anxious and depressed mood and was concerned about his health problems and the fact that he had to move into a new apartment. (R. 468, 470, 472).

From June 30, 2017 until October 30, 2017, Plaintiff's depression and anxiety were routinely 4/10, and occasionally 3–4/10, with no intensification of symptoms. (R. 1020–31). He reported experiencing anxiety, a depressed mood, chronic pain, and worry about his SSDI case. (*Id.*). On October 13, 2017, his "sciatica [was] particularly troubling" him. (R. 1028).

From November 13, 2017 until January 11, 2018, Plaintiff's depression was 3–4/10 and his anxiety was 6–7/10. (R. 1032–39). He was happy about finding a new, cheaper apartment, but his anxiety increased with his pending move. (R. 1034, 1038). On March 9, 2018, Plaintiff's anxiety and depression were both 3–4/10, and Plaintiff was happy that he was more social at his new apartment, although his anxiety, depression, and chronic pain continued. (R. 1040–41).

On March 23 and April 6, 2018, Plaintiff's depression and anxiety were 3–4/10. (R. 1042–45). On April 20, May 9, June 1, June 22, July 13, August 17, and September 21, 2018, Foresti noted that Plaintiff had a "moderate" mood disorder, including depressed mood, low self-esteem, and anhedonia, and moderate anxiety, with slightly worse symptoms, but no cognitive dysfunction or behavior concerns. (R. 1046–51). On June 22 and July 13, 2018, Plaintiff's mental and physical statuses were unchanged, but Foresti noted that Plaintiff had requested a letter for his attorneys "regarding the negative impacts of depression (primary), anxiety (co-morbid) and chronic back pain on his daily life" and "how the symptoms negatively impact/substantially limit major life activities." (R. 1052–55).

On October 26, November 16, November 30, December 12, and December 26, 2018, and January 11, 2019, Plaintiff's mood disorder was mild, and his anxiety was moderate, with no intensification of symptoms, cognitive dysfunction, or behavior concerns. (R. 1060–1075). He was anxious about applying for Section 8 housing, (R. 1061, 1075), and Foresti assisted Plaintiff with completing several Section 8 housing applications, (R. 1064–73).

On January 23 and February 22, 2019, Foresti found mild mood disorder, moderate anxiety, and that Plaintiff had mild cognitive dysfunction and poor concentration, noting on January 23 that Plaintiff "appears to have difficulty with reading comprehension and concentration." (R. 1072–75).

On March 15 and April 12, 2019, Plaintiff presented with a mild mood disorder and mild to moderate anxiety. (R. 1291–94). He had mild cognitive dysfunction, with poor concentration. (*Id.*). He had no intensification of symptoms and was slightly improved on March 15. (*Id.*).

On April 26, June 4, June 20, July 5, and August 9, 2019, Plaintiff's mood disorder was mild, his anxiety was moderate, or "Moderate +," and his cognitive dysfunction was mild with poor concentration. (R. 1293–1303). He had no intensification of symptoms; Foresti's notes reflect that Plaintiff was accepted to receive a Section 8 apartment, was anxious to move and about his SSDI hearing, and worried about his chronic pain. (*Id.*).

### c.      Pulmonary Health Physicians

Plaintiff has been treated at Pulmonary Health Physicians since 2015. (R. 421). As relevant here, Plaintiff was seen on January 4, 2017, March 7, 2018, September 7, 2018, and May 15, 2019, by several different providers. The progress notes reflect severe COPD, tobacco use disorder, obesity, and obstructive sleep apnea. (R. 405, 973, 968. 1185). His symptoms included dyspnea on exertion, occasional wheezing, and coughing. (*Id.*). At each appointment, Plaintiff was noted to be unable to use a CPAP machine, but clinically stable and compliant with

using his inhalers, and was advised to quit smoking or discussed his smoking with providers. (R. 407, 970, 973, 975, 1185). At his May 15, 2019 visit, Dr. Edward T. Downing, MD, noted that that although Plaintiff was "unable to work," he was "currently able to do activities of daily living without limitations . . . able to do housework with limitations." (R. 1185). At each of his appointments, Plaintiff's musculoskeletal assessment showed normal coordination, normal facial, thoracic spine, and lumbosacral spine movements, and his mental status exams were normal. (R. 407, 970, 975, 1187).

### d.    New York Spine and Wellness Center

Plaintiff received a Lumbar Transforaminal Epidural Steroid Block on February 24, 2017. (R. 431).

Plaintiff saw Mark Profetto, NP on June 1, 2017, complaining of back pain radiating into his lower extremities. (R. 493, 496). Plaintiff stated his pain was 0/10, but his average pain was 5/10. (R. 493). Plaintiff stated that the recent lumbar transforaminal nerve block provided him "very little relief." (R. 496). NP Profetto planned to "add another level to the block." (*Id.*). Plaintiff received a second steroid block on June 29, 2017. (R. 696, 705).

Plaintiff saw NP Profetto again on October 26, 2017. (R. 995). Plaintiff reported that his back pain was 6/10, aching, constant, unchanged, and exacerbated by lifting, sitting, standing, and walking. (R. 996). Plaintiff agreed to try a muscle relaxer. (R. 999).

Plaintiff saw NP Profetto on March 15, 2018, and reported aching, intermittent, and unchanged back pain, exacerbated by bending and walking. (R. 1000–01). His minimum pain level was 5/10 and maximum 10/10. (*Id.*). Plaintiff stated he experienced 100% pain relief for one day after the nerve block, and then his symptoms gradually returned. (*Id.*). Plaintiff reported that nothing seemed to be working, including nerve blocks, and asked about surgical options; NP Profetto referred Plaintiff to Dr. Wulff at Syracuse Orthopedic Specialists. (*See* R. 1004).

On August 13, 2018, Plaintiff told NP Profetto that his back pain was aching, constant, unchanged, and exacerbated by walking and working. (R. 1006). He reported a current pain level of 5/10. (*Id.*). Plaintiff reported that he met with Dr. Wulff, who suggested a spinal cord stimulator, and he was scheduled with Dr. Mary Trusilo to see if he was a candidate. (R. 1009).

On October 9, 2018, Plaintiff saw Dr. Trusilo. (R. 1010). He described his pain as aching and intermittent, and reported a current pain level of 6/10. (R. 1011). Dr. Trusilo found on physical examination that Plaintiff's "[g]ait was normal," Plaintiff had "tenderness on palpation of lumbar spine and paraspinous regions," as well as his left sciatic notch, and Plaintiff's range of motion was normal and "without pain" as to flexion, extension, and rotation. (R. 1013). Plaintiff had 5/5 flexion and extension of the hips, knees, and feet, and a positive straight leg raise. (*Id.*). Dr. Trusilo noted a small disc protrusion, and scheduled Plaintiff for a spinal cord stimulator insertion and trial screening for Nevro and Duricef prophylaxis. (R. 1013–14).

Plaintiff saw NP Profetto on December 31, 2018, reporting 4/10 intermittent aching back pain, which was exacerbated by bending and walking, and radiated into his bilateral lower extremities. (R. 1016, 1019). NP Profetto noted that they would be proceeding with a trial of a spinal cord stimulator. (R. 1019).

On May 9, 2019, Plaintiff saw Christopher Morris, NP, complaining of lumbar pain going down his left leg. (R. 1286). He described his pain 7/10, aching, intermittent, unchanged, and exacerbated by bending and walking. (R. 1287). Plaintiff reported that he wished to hold off on the spinal cord stimulator and would repeat his left lumbar transfemoral block. (R. 1290).

### e.    Physical Therapy Plus

Plaintiff began physical therapy on August 21, 2017. He indicated that he had a "long-standing history of chronic low back pain," and that he had worked at UPS for over 25 years before a "forced retirement." (R. 957). He reported that his pain ranged from 2/10 to 10/10, and

was exacerbated with long-term sitting and walking and increased activity. (*Id.*). Changing positions provided some relief. (*Id.*).

In notes taken at subsequent visits, Plaintiff's back pain was noted to be "no better, no worse," (August 31, 2017), and "still bothering him," (September 7, 2017). (R. 959). On September 11, 2017, Plaintiff reported that his "whole body hurts" and that his back and shoulder had been "more sore." (R. 960). On September 18, 2017, Plaintiff was "not feeling much better," and on September 25, he was feeling "real bad." (*Id.*). September 28, 2017 was "the best [he had] felt yet," and on October 16, 2017 Plaintiff was "feeling better," on November 10, 2017, he was doing "alright," and on November 30, 2017 he was "doing okay." (R. 960–61).

On December 1, 2017, Plaintiff complained of occasional general mild lower back pain ranging from 0/10 to a 5/10, exacerbated by twisting and bending. (R. 958). The clinician noted that Plaintiff had been "discharged to a home program" because he reached his yearly insurance allotment and the maximal medicinal benefit from physical therapy. (*Id.*).

### f.  Syracuse Orthopedic Specialists

On April 10, 2018, Plaintiff saw orthopedist Dr. Warren E. Wulff, MD. (R. 963). Dr. Wulff noted that Plaintiff struggled with chronic back pain that "seems to be worsening over time" and "not [be] improving" despite treatments through a pain clinic, including receiving nerve blocks and physical therapy. (*Id.*). Dr. Wulff reviewed Plaintiff's lumbar MRI from April 2017 and noted "minor degenerative changes at the L5-S1 level not causing any significant stenosis," and that the MRI was otherwise "pretty normal." (R. 967). Plaintiff's coordination and gait were normal. (R. 966). Dr. Wulff noted that Plaintiff was able to get on and off the exam table, "walk on toes and heels bilaterally," exhibited "no muscular atrophy" in his upper or lower extremities, and had normal "spinal alignment," "5/5 motor strength" in the upper and lower extremities, "normal sensation" in the lower extremities, and negative straight leg tests. (R. 966–

67). Dr. Wulff observed that Plaintiff's "[s]tation is slightly stooped forward," found Plaintiff had "[m]oderately limited and painful" range of motion in his lumbar spine, and noted that "[p]alpation of the lumbar spine reveals moderate focal tenderness in the midline and paraspinal muscle tenderness is present on both sides." (*Id.*). Dr. Wulff found "no surgical indication," but instructed Plaintiff to continue with pain management services, and to discuss the possibility of a dorsal column stimulator with his pain clinic. (*Id.*). In a "Work/School Note," Dr. Wulff wrote that Plaintiff's percentage of temporary impairment was 75%, and that he should not lift more than twenty pounds, bend or twist repetitively, or use heavy equipment, and only sit, stand, and walk as tolerated. (*Id.*).

### g. Saint Joseph's Physicians Urgent Care

On January 21, 2018, Plaintiff went to St. Joseph's Physicians Urgent Care, where he complained of severe (10/10) back pain that was aggravated by sitting, standing, and twisting. (R. 1179). He reported that NSAIDs and muscle relaxants had provided "mild relief." (R. 1179–80). Notes reflect "[m]idline low back pain with left-sided sciatica, unspecified chronicity" and that Plaintiff was directed to rest, use ice and/or heat therapy, continue using Ibuprofen and Flexaril as needed, and follow up with New York Spine and Wellness. (R. 1179).

### 2. Evaluations

### a. Consultative Examiner Corey Anne Grassl, Psy.D.

On July 11, 2017, Consultative Examiner Corey Anne Grassl, Psy.D. performed a psychiatric evaluation. (R. 615). Plaintiff reported difficulty with sleep, a normal appetite, and depressive symptomology beginning in childhood, including sad moods, guilt, hopelessness, loss of interest, irritability, worthlessness, diminished self-esteem, and social withdrawal. (*Id.*). He denied having suicidal or homicidal ideation, but "endorsed" anxiety-related symptoms such as excessive worry, restlessness, and muscle tension. (R. 615–16). He denied panic attacks, manic

symptomatology, formal thought disorder, or cognitive deficits. (R. 616). Plaintiff reported no current drug or alcohol use, but a history of alcohol abuse beginning at age 13, and crack cocaine abuse beginning at age 30, both ending in 2015. (*Id.*). Plaintiff told Dr. Grassl that he attended inpatient treatment in 2010, and currently attends AA meetings. (*Id.*).

On mental status examination, Dr. Grassl found Plaintiff "cooperative," that his "manner of relating was adequate," "mode of dress" and eye contact were "appropriate," he was well groomed, and his posture and motor behavior were normal. (*Id.*). Dr. Grassl found Plaintiff's "expressive and receptive language" to be "adequate," that his thought process was coherent and goal directed, and his affect and mood were anxious. (*Id.*). He was oriented to person, place, and time, with intact attention and concentration and recent and remote memory skills. (R. 617). His cognitive functioning was "average," and insight and judgment were "[f]air." (*Id.*).

Dr. Grassl found no evidence of limitations in Plaintiff's ability to: 1) understand, remember and apply simple directions; 2) understand, remember, and apply complex directions; 3) use reason and judgment; 4) maintain personal hygiene and appropriate attire; and 4) be aware of normal hazards. (*Id.*). She found mild limitations in Plaintiff's ability to interact adequately with supervisors, coworkers, and the public, and moderate limitations in his ability to: 1) sustain concentration and perform a task at a consistent pace; 2) sustain an ordinary routine and have regular attendance; and 3) regulate his emotions, control his behavior, and maintain his well-being. (R. 617–18). She noted that his difficulties were "caused by psychiatric problems," but did not "appear to be significant enough to interfere with [his] ability to function on a daily basis." (R. 618). Dr. Grassl indicated that Plaintiff's prognosis was "fair," given his engagement in psychiatric and substance abuse treatment. (*Id.*).

**b.     Consultative Examiner Elke Lorensen, MD**

On June 3, 2019, Plaintiff met with Consultative Examiner Dr. Elke Lorensen who performed an orthopedic examination. (R. 1141). Plaintiff reported that he stopped working when he was having problems with substance use. (*Id.*). He told Dr. Lorenson that his back pain came on without a specific inciting event but that he did a lot of heavy lifting when he worked at UPS. (*Id.*). Plaintiff reported receiving nerve blocks for his back pain and taking cyclobenzaprine. (*Id.*). He reported that his lumbar back pain was chronic, aggravated by bending, lifting, prolonged walking, and getting up from a sitting position, and radiated into his left thigh. (*Id.*).

Dr. Lorsensen noted that Plaintiff was able to cook, clean with breaks, do laundry with breaks, and go shopping once per week slowly. (R. 1142). He could shower and dress himself, and he watched TV, listened to the radio, and volunteered. (*Id.*).

On physical examination, Dr. Lorensen noted that Plaintiff did not appear to be in acute distress, had a normal gait, was able to walk on his toes but not his heals, could squat "40%," and did not need assistance changing for the exam, getting on and off the exam table, or rising from his chair. (*Id.*). His hand and finger dexterity were intact, and his grip strength was "5/5." (*Id.*). Regarding his cervical spine, he had full flexion, extension, lateral flexion, and rotary movements, and had no cervical or paracervical pain or spasm. (*Id.*). Regarding his thoracic and lumbar spine, he had a flexion of 60 degrees, extension of 30 degrees, lateral flexion of 30 degrees, and rotation of 20 degrees, with no spinal, paraspinal, SI joint, or sciatic notch tenderness. (R. 1143). Straight leg test was negative bilaterally. (*Id.*). Dr. Lorensen found that Plaintiff had full range of motion of knees and ankles; his hip flexion was "70 degrees bilaterally"; his strength was "5/5 in proximal and distal muscles bilaterally"; and he had no muscle atrophy or "sensory abnormality." (*Id.*).

Dr. Lorensen signed a Medical Source Statement of Ability to do Work-Related

Activities (Physical). (R. 1147). She indicated that Plaintiff could lift and carry up to 10 pounds

continuously, 11 to 20 pounds frequently, 21 to 50 pounds occasionally, and never lift or carry

51 to 100 pounds. (*Id.*). She found that he could sit and stand for four hours at a time without

interruption and walk for one hour at a time without interruption. (R. 1148). He could sit and

stand for eight hours total in an eight-hour workday and walk for four hours total in a workday.

(*Id.*). Dr. Lorensen found that Plaintiff could never reach overhead, could occasionally reach

otherwise, occasionally push/pull, and continuously handle, finger, and feel. (R. 1149). He could

occasionally operate foot controls. (*Id.*). He could never climb ladders or scaffolds or balance,

and occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl. (R. 1150). He could

never be exposed to unprotected heights or moving mechanical parts, and could occasionally be

exposed to operating a motor vehicle, humidity and wetness, dust, odors, fumes, and pulmonary

irritants, extreme cold, extreme heat, and vibrations. (R. 1151). Dr. Lorensen found that Plaintiff

could shop, travel alone, ambulate, walk one block, use public transportation, climb a few steps,

prepare a meal, care for his hygiene, and sort, handle, or use paper/files. (R. 1152).

### 3.  Medical Source Statements

#### a.  Robert Foresti, LCSW-R

Foresti completed a Medical Source Statement on October 13, 2017 (the "Foresti

Opinion"). (R. 623–25). Foresti indicated that he meets with Plaintiff for 45–55 minutes twice a

month. (R. 621). In the DSM-IV Multiaxial Evaluation, he indicated at Axis I: Major Depressive

(Recurrent-F33.9), and at Axis III: Chronic Back and Hip Pain. (*Id.*). He gave Plaintiff a

prognosis of "poor." (*Id.*).

Foresti identified Plaintiff's signs and symptoms as anhedonia, decreased energy, feelings

of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or

concentrating, persistent disturbances of mood or affect, easy distractibility, and sleep disturbance. (*Id.*).

Regarding Plaintiff's ability to do work-related activities, Foresti indicated that Plaintiff: 1) had an "unlimited or very good" ability to carry out instructions, sustain a routine, ask questions, accept instructions, and maintain socially acceptable behavior; 2) had a "limited but satisfactory" ability to remember procedures, understand and remember instructions, maintain attention for a two-hour segment, maintain regular attendance and be punctual, work in coordination with or proximity to others, make simple decisions, complete a normal workday and workweek without interruptions, respond appropriately to changes, be aware of normal hazards, adhere to basic standards of neatness, and use public transportation; 3) had a "seriously limited, but not precluded" ability to perform at a consistent pace, deal with work stress, and interact with the public; and 4) was "unable to meet competitive standards" at travelling in an unfamiliar place. (R. 622). For these last two categories, Foresti explained that he found these limitations because Plaintiff's anxiety and depression, exacerbated by his chronic pain, "may seriously impact [his] ability to meet work-related standards." (*Id.*).

Foresti noted that Plaintiff's psychiatric condition exacerbates his pain, because his "[a]wareness of physical stress exacerbate[s] an[d] vice-versa." (R. 623). He indicated that Plaintiff has "repeated episodes of deterioration" in work settings, has "deficiencies of concentration, persistence, or pace," and would be off task more than 20% of a workday. (*Id.*). He noted that Plaintiff's impairments are likely to produce "good" and "bad" days, and that he would likely be absent from work more than four days per month as a result of his impairments or treatment. (*Id.*). Finally, Foresti noted that Plaintiff's anxiety and depression had existed for most of his adult life. (R. 624).

### b.      Brittany Miller PA-C and Rajeev Saini, MD

On April 16, 2019, PA Miller and Dr. Saini co-signed a Medical Source Statement (the "Miller/Saini Opinion"). (R. 1131). They indicated that they had seen Plaintiff every two months since 2016, and that he had diagnoses of Type II Diabetes, hypertension, hyperlipidemia, GERD, depression, back pain, neck pain, and substance and nicotine abuse. (*Id.*). They described his prognosis as "good." (*Id.*).

PA Miller and Dr. Saini identified the following functional limitations: Plaintiff could walk one city block without rest or severe pain; he could sit or stand for 15 minutes at a time, and for less than two hours total in an eight hour workday; he needed a job that would permit shifting positions at will, and would need to take unscheduled breaks every hour for five to ten minutes; Plaintiff could never lift 50 pounds, and could occasionally lift less than 10 pounds, 10 pounds, or 20 pounds; Plaintiff could never stoop/bend or crouch/squat, could rarely climb ladders, and occasionally twist and climb stairs; Plaintiff could rarely reach his arms and occasionally grasp/turn/twist objects and do fine manipulations with his fingers. (*Id.*).

Regarding Plaintiff's mental abilities and aptitudes, PA Miller and Dr. Saini stated that Plaintiff had an unlimited or very good ability to remember work-like procedures, maintain regular attendance, and be aware of normal hazards; a limited but satisfactory ability to understand, remember, and carry out short instructions, sustain an ordinary routine, and respond appropriately to changes; a seriously limited but not precluded ability to work in coordination with others, complete a normal workday and workweek without interruptions, perform at a consistent pace without an unreasonable number of rest periods, ask questions, and get along with co-workers or peers; and that Plaintiff was unable to meet competitive standards in maintaining attention for two-hour segments, making simple work-related decisions, accepting instructions and responding to criticism, and dealing with normal work stress. (R. 1133). PA

Miller and Dr. Saini explained that Plaintiff has social anxiety, gets nervous around others, and has difficulty focusing for extended periods of time and making sound decisions, and that he was on Zoloft and attending AA meetings. (*Id.*). They concluded that Plaintiff would be off-task more than 20% of the time in an eight-hour workday, that his impairments would result in "good and bad" days and would cause him to be absent more than four days a month. (R. 1133–34).

### D.    Hearing Testimony from Vocational Expert

At Plaintiff's October 2, 2019, hearing, the ALJ identified a number of specific abilities and limitations, including, as relevant here: 1) the physical ability to lift and carry 50 pounds occasionally, 20 pounds frequently, and 10 pounds continuously, sit and stand for eight hours with some walking, and occasionally reach and operate foot controls, and 2) the mental ability to handle simple instructions, simple tasks and "simple repetitive work-related stress," but the inability to handle "complex interaction" or "joint effort to achieve work goals." (R. 60–61). The ALJ asked the vocational expert whether an individual with those limitations and Plaintiff's education and work experience could perform Plaintiff's past relevant work or any other job. (R. 61). The vocational expert responded that such an individual could not perform Plaintiff's past relevant work but could perform the jobs of order caller, shipping and receiving weigher, and counter clerk. (R. 61–62). The vocational expert further opined that if such an individual were off task more than 20% of the workday or were absent three or more days per month, these limitations would affect the individual's ability to perform full-time work. (R. 63–64).

### E.    The ALJ's Opinion Denying Benefits

The ALJ concluded that "the claimant has not been under a disability within the meaning of the Social Security Act from April 30, 2017, through the date of this decision." (R. 11). She engaged in the required "five-step sequential evaluation process for determining whether an

individual is disabled" in reaching this conclusion. (*Id.* (citing 20 CFR §§ 404.1520(a) and 416.920(a))).[9]

      As a threshold matter, the ALJ determined that Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2018." (R. 13). At step one, the ALJ determined that Plaintiff had not engaged in "substantial gainful activity" since April 30, 2017, and therefore had not been working since his alleged disability onset date. (*Id.* (citing 20 C.F.R. §§ 404.1571 and 416.971)). Although Plaintiff worked after his alleged disability onset date for People's Equal Action and Community Effort, his earnings did not rise to "the level indicative of substantial gainful employment." (*Id.*).

      At step two, the ALJ determined that Plaintiff suffered from "the following severe impairments: all mental impairments as variously categorized, degenerative disc disease of the lumbar spine, chronic obstructive pulmonary disease, and vertigo." (*Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c))). The ALJ noted that Plaintiff's mental impairments "result in the following limitations: moderate restriction in understanding, remembering, or applying information; moderate difficulties in interacting with others; mild difficulties in maintaining concentration, persistence or pace; and mild difficulties in adapting or managing oneself," and considered Dr. Grassl's consultative examination in reaching this conclusion. (R. 14). The ALJ

---

[9] Under the five-step analysis for evaluating disability claims:

    [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

concluded that "[t]he above medically determinable impairments significantly limit the ability to perform basic work activities." (*Id.*).

At step three, although the ALJ determined that Plaintiff suffers from severe impairments, she found that none of Plaintiff's impairments met or equaled the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 requiring a finding of disability. (R. 15).

Because the ALJ found that Plaintiff's mental impairments did not cause "as least one extreme limitation or two marked limitations" that would satisfy the paragraph B criteria, she turned to the "paragraph C" criteria. (R. 16). The ALJ found that the record did not demonstrate that "the claimant has had only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." (*Id.*).

Before moving to step four, the ALJ determined that:

> . . . the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift and/or carry 50 pounds occasionally, 20 pounds frequently, and ten pounds continuously. He can sit for eight hours, stand for eight hours, and walk for four hours. He can sit for four hours at a time, stand for four hours at a time, and walk for one hour at a time. Overhead reaching can be done occasionally and all other directions can be done frequently. Operation of foot controls occasionally. He can never climb ladders or scaffolds or balance; and all other postural activities can be performed occasionally. He can never work at unprotected heights or around moving mechanical parts. He has no concentrated exposure to respiratory irritants, but can tolerate exposure to smoke. He retains the ability to understand and follow simple instructions and directions, perform simple tasks independently, maintain attention and concentration for simple tasks, regularly attend to a routine and maintain a schedule, and handle simple, repetitive work-related stress in that he is able to make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others. The

> claimant must avoid work that requires more complex interaction or joint efforts to achieve work goals.

(*Id.*). The ALJ utilized a "two-step process," requiring first that the ALJ determine whether there is an "underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms." (*Id.*). Second, an ALJ must evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." (R. 16–17). Applying this two-step process, ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 17). In coming to this determination and formulating Plaintiff's RFC, the ALJ considered the medical opinions in the record from, as relevant here, consultative examiners Drs. Lorensen and Grassl and Plaintiff's treating providers, Foresti, PA Miller, and Dr. Saini. (R. 17–19).

The ALJ found the opinions of consultative examiners Drs. Lorensen and Grassl to be "persuasive." (R. 17). The ALJ noted that with the exception of the "reaching overhead and environmental restrictions," which were not supported by the record and which she did not adopt, Dr. Lorensen's opinion was "well supported" by factual findings from her physical examination. (*Id.*). The ALJ found Dr. Grassl's assessment to be "generally supported by the mental status examination performed on the claimant," and by Plaintiff's report that his symptoms improved with medication. (R. 18).

The ALJ did "not find" the Foresti Opinion, the Miller/Saini Opinion, Dr. Wulff's opinion,[10] or the opinion of Dr. John Sun, one of Plaintiff's pulmonologists,[11] "to be very persuasive as they generally contain limitations based on the claimant's subjective self-reports or are contradicted by the objective evidence in [the] record." (*Id.*). The ALJ noted that the record showed that Plaintiff could "perform a range of activities that require significant physical/mental demands." (*Id.*).

As to Foresti's opinion, the ALJ noted that although Foresti acknowledged that Plaintiff's depression and anxiety had existed his entire adult life, Plaintiff engaged in work activity without an indication of decline in his psychiatric conditions. (*Id.*). The ALJ found that the evidence in the record showing that Plaintiff told Foresti he "wanted a letter regarding the negative impact of the claimant's psychiatric impairments" suggested that Foresti's "assessment was influenced by the representative's request." (*Id.*). Foresti wrote that his opinion was based partly on Plaintiff's "physical impairments," which the ALJ noted was "beyond the scope of his treating relationship." (*Id.*).

With respect to the Miller/Saini Opinion, as well as the opinions of Drs. Wulff and Sun, concerning Plaintiff's exertional limitations, the ALJ noted that the restrictions they identified are "contradicted by the minimal abnormal clinical findings identified in diagnostic images of the claimant's lumbar spine," Plaintiff's reports of improvement in pain, improvement through physical therapy, their own examinations, and Dr. Lorensen's findings on examination. (R. 18–19).

---

[10] Dr. Wulff, Plaintiff's orthopedist, stated in progress notes dated April 10, 2018: "The percentage of temporary impairment is 75%. The patient is not working at this time. No lifting greater than 20 lbs. No repetitive bending, twisting. Sit, stand, walk as tolerated. No use of heavy machinery or equipment." (R. 967).

[11] Dr. John Sun, one of the doctors who treated Plaintiff at Pulmonary Health Physicians, saw Plaintiff on March 13, 2019, and noted that Plaintiff "is compromised with exertional activities such as riding his bike which he had always liked to do. (R. 18).

With respect to the Foresti and Miller/Saini Opinions regarding Plaintiff's mental limitations, and in particular, their finding that  Plaintiff would be off task "more than 20% of the day and absent from work more than four days per month," the ALJ noted that this finding was "speculative and not based on objective findings," and contradicted by progress notes "which indicated that the claimant's psychiatric evaluations were normal" as well as by Dr. Grassl's observations of Plaintiff. (R. 19).

At step four, the ALJ determined that Plaintiff is unable to perform "any past relevant work" based on the vocational expert's testimony. (*Id.*). At step five, the ALJ relied on the vocational expert's testimony to conclude that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 23). Accordingly, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from April 30, 2017, through the date of this decision." (*Id.* (citing 20 C.F.R. §§ 404.1520(g) and 416.920(g))).

## III.    DISCUSSION

### A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable

factfinder would have to conclude otherwise." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

### B.    Analysis

Plaintiff argues that the "ALJ's determination is unsupported by substantial evidence as she failed to properly evaluate the opinion evidence," specifically, the Miller/Saini and Foresti Opinions. (Dkt. No. 15, at 16–25). Historically, the "treating physician rule" required that "[t]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment [be] given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (quoting *Burgess*, 537 F.3d at 128). However, for claims filed on or after March 27, 2017, regulations regarding the evaluation of medical evidence have been amended and several of the prior Social Security Rulings have been rescinded. *See* 20 C.F.R. §§ 404.1527, 416.927 (noting applicability only to "claims filed before March 27, 2017"). In accordance with the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the*

*Evaluation of Medical Evidence ("Revisions to Rules")*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017); *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c). The ALJ is still required to "articulate how [he] considered the medical opinions" and "how persuasive [he] find[s] all of the medical opinions." *Id*. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors" for determining the persuasiveness of medical opinions are consistency and supportability, and an ALJ is required to "explain how [he] considered the supportability and consistency factors" for a medical opinion. *Id*. at §§ 404.1520c(b)(2), 416.920c(b)(2).

With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2). An ALJ must consider, but is not required to discuss, the three remaining factors when determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).

Because Plaintiff filed his application for benefits on April 26, 2017, (R. 10), his claim is governed by the new regulations.

### 1.    Miller/Saini Opinion

Plaintiff first argues that substantial evidence does not support the ALJ's RFC

determination because she failed to properly evaluate the Miller/Saini Opinion. (Dkt. No. 15, at

17–23). Plaintiff argues that the ALJ improperly "lumped together" her analysis of the

Miller/Saini Opinion and the opinions of Drs. Wulff and Sun, and "never mention[ed]" the

factors of supportability and consistency. (*Id.* at 18). Defendant responds that the ALJ adequately

explained how she considered the supportability and consistency factors when evaluating the

persuasiveness of the Miller/Saini Opinion, and that substantial evidence supported her finding

that the opinion was not very persuasive. (Dkt. No. 20, at 5).

As a threshold matter, although, as Plaintiff notes, the ALJ did not use the words

supportability or consistency in the analysis, this omission does not warrant remand where, as

here, the ALJ expressly relied on the proper regulations, (*see* R. 16 ("The undersigned has . . .

considered the medical opinion(s) . . . in accordance with the requirements of 20 CFR 404.1520c

and 416.920c.")), and, more importantly, the ALJ's analysis of the Miller/Saini Opinion shows

consideration of those factors, *see Acosta Cuevas v. Comm'r. of Soc. Sec.*, No. 20-cv-0502, 2021

WL 363682, at *15, 2021 U.S. Dist. LEXIS 19212, at *45 (S.D.N.Y. Jan. 29, 2021) ("Without

stating it explicitly, the ALJ did engage in a consistency analysis."), *report and recommendation

adopted and modified on non-substantive grounds* 2022 WL 717612, 2022 U.S. Dist. LEXIS

42979 (S.D.N.Y. Mar. 10, 2022). In explaining why she found the Miller/Saini Opinion to not be

very persuasive, the ALJ addressed the medical evidence on which PA Miller and Dr. Saini

based their opinion, as required by the supportability factor. *See id.*, 2021 WL 363682, at *10,

2021 U.S. Dist. LEXIS 19212, at *28 (explaining that supportability is "an inquiry geared toward

assessing how well a medical source supported and explained their opinion(s)"). Specifically, the

ALJ noted that: 1) the Opinion was based "generally" on Plaintiff's "subjective self-reports"; 2)

not supported by progress notes from PA Miller and Dr. Saini's office, which reflect improvement in Plaintiff's sciatic pain and normal psychiatric exams; and 3) "speculative and not based on any objective findings," insofar as the Opinion indicated that Plaintiff "would be off task more than 20% of the day and absent from work more than four days per month." (R. 18–19). In addition, the ALJ's decision also shows that the ALJ explicitly compared the Miller/Saini Opinion to the medical evidence and other opinions in the record, as required by the consistency factor. *See Acosta Cuevas*, 2021 WL 363682, at *15, 2021 U.S. Dist. LEXIS 19212, at *45 (explaining that the consistency factor "calls for a comparison between the medical source's opinion and 'evidence from other medical sources and nonmedical sources' in the file"). The ALJ observed the consistency between the Miller/Saini Opinion and the opinions of Drs. Wulff and Sun, noting that they each identified "significant exertional restrictions," as well as the consistency between the Miller/Saini and Foresti Opinions, noting that both Opinions identified "significant mental restrictions." (R. 18–19). However, the ALJ ultimately concluded that the Miller/Saini Opinion was inconsistent with physical therapy records, diagnostic images, progress notes from PA Miller and Dr. Saini's office, Drs. Lorensen and Grassl's consultative examinations, progress notes from Foresti's office, and the psychiatric evaluations conducted by Plaintiff's various providers. (R. 18–22). Thus, the ALJ adequately explained her consideration of the supportability and consistency factors.

Further, the ALJ's supportability and consistency findings, and the reasons she provided for her conclusion that the Miller/Saini Opinion was not very persuasive, are supported by substantial evidence. Regarding supportability, the regulations state that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be."

20 C.F.R. § 404.1520c(c)(1). Here, as the ALJ noted, there is a lack of *objective* clinical findings to support the Miller/Saini Opinion's severe exertional and mental limitations. As to exertional limitations, PA Miller and Dr. Saini opined, inter alia, that Plaintiff could only walk one city block, sit and stand for fifteen minutes at a time, "occasionally" lift less than 10 pounds, and "occasionally" grasp, turn, and twist objects. (R. 1131–32). PA Miller and Dr. Saini, however, offered no objective findings supporting these conclusions, and objective findings in their own treatment records bely them: Plaintiff's physical examinations at Northway were routinely normal. (R. 435, 1078, 1084, 1089, 1093, 1100, 1104, 1110, 1125, 1306–07, 1311–12). As the ALJ explained, these exertional limitations "are contradicted by the minimal abnormal clinical findings" in the record, including progress notes indicating that Plaintiff's sciatic nerve pain was "better," (R. 18 (citing R. 1304 (sciatic pain "better")); *see also* R. 1076, 1082, 1087, 1098, 1102 (same)), an April 2017 lumbar MRI, (R. 18 (citing R. 437); *see also* R. 967 (Dr. Wulff describing the MRI as showing "minor degenerative changes" but otherwise "pretty normal")), and Plaintiff's improvement in physical therapy, (R. 18 (citing R. 958 (noting Plaintiff's complaint of "occasional general mild low back pain")); *see also* R. 960–61 (noting Plaintiff's low back was feeling better)). Objective evidence elsewhere in the record likewise bely these exertional limitations: musculoskeletal assessments showed normal coordination, normal facial, thoracic spine, and lumbosacral spine movements, (R. 407, 970, 975, 1187, 1142), and physical examinations showed that Plaintiff's "[g]ait was normal," (R. 1013, 1142), that his range of motion was normal and "without pain" as to flexion, extension, and rotation, (R. 1013), that he had "5/5 motor strength" in the upper and lower extremities, (R. 966–67), and that his hand and finger dexterity were intact, (R. 1142). *See Victor B. v. Comm'r of Soc. Sec.*, No. 20-cv-1154, 2021 WL 3667200, at *4, 2021 U.S. Dist. LEXIS 155327, at *9–10 (W.D.N.Y. Aug. 18, 2021)

(finding that the ALJ properly concluded that a Physician's Assistant's opinion was inconsistent with the record evidence under the new regulations when "her opinion was not consistent with the entirety of the record," even though she had a treating relationship with the plaintiff).

Plaintiff argues that the ALJ undertook a "selective reading" of the evidence, "picking and choosing to support [her] reasoning." (Dkt. No. 15, at 19–21). First, Plaintiff takes issue with the ALJ's reading of the physical therapy notes as showing improvement. (*Id.* at 19). The Court agrees that the ALJ's reference to Plaintiff's reports of "improvement in his back pain with physical therapy" does not fully encompass the record: although Plaintiff reported doing "better," "okay," and "alright," he also reported feeling "more sore" and "real bad" at prior appointments, and when he returned on December 1, 2017, he reported continuing back pain, and that he had only ceased physical therapy because he had reached his insurance allotment as well as the maximum medicinal benefit. (R. 957–61). Records from Dr. Wulff and PA Miller and Dr. Saini indicate that physical therapy was not effective. (R. 963, 1123). However, an ALJ is not required to "explicitly to reconcile every conflicting shred of medical testimony" in her decision. *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981); *see also Tenesha G. v. Comm'r of Soc. Sec.*, No. 20-cv-1070, 2022 WL 35998, at *5, 2022 U.S. Dist. LEXIS 1343, at *13 (N.D.N.Y. Jan. 4, 2022) (dismissing the plaintiff's "citations to other piece of evidence in the record that, in her view, tend to support a conclusion that is different than the one reached by the ALJ" because a "reviewing court 'defer[s] to the Commissioner's resolution of conflicting evidence'") (citing *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012)). Moreover, the records from physical therapy show, if not resolution, some improvement over time of Plaintiff's back pain. (*See* R. 959–61 (notes spanning September 11, 2017 to November 22, 2017 reflecting complaints such as "whole body hurts," "not feeling must better today," "feeling real bad today" progressed

to "today is the best I've felt yet," "feeling better today, he still have some pain running down his leg but it is not as bad as it used to be," "minimal" low back pain but "sciatic nerve pain is there")). The Court therefore finds substantial evidence supports the ALJ's reliance on Plaintiff's physical therapy records as showing improvement.

Second, Plaintiff takes issue with the ALJ's conclusion that PA Miller and Dr. Saini's progress notes are inconsistent with their opined exertional restrictions, arguing that the progress notes reflect continuing back pain. (Dkt. No. 15, at 20 (citing R. 622 (PA Miller noting sciatic pain), 628 (Dr. Saini noting "some exacerbation of his [sciatic] pain"), 629 (Dr. Saini noting that examination "revealed some discomfort of the lower back" and "straight leg raise up to 60 degrees on the left and up to 70 degrees on the right,"), 1304 (noting that Plaintiff was considering a stimulator implant "at the end of the month"))). However, with one exception, the progress notes that Plaintiff cites are from 2017 and predate the progress notes reflecting that Plaintiff's sciatic nerve pain was "better" beginning on February 26, 2018 and continuing to August 20, 2019, (R. 1102, 1106, 1108, 1111, 1080–82, 1304–09). The exception is the August 20, 2019 progress note, which indicates that Plaintiff's sciatic pain was better but that he was scheduled for a stimulator implant procedure at the end of the month. (Dkt. No. 15, at 20 (citing R. 1304)). Even assuming the pre-February 2018 progress notes showing sciatic and back pain conflict with the post-February 2018 progress notes, which show improvement but also that Plaintiff was still receiving treatment for back pain, it was a conflict the ALJ was tasked with resolving, and which she did by concluding that Plaintiff's back and sciatic pain had improved over time. *See Fox v. Colvin*, 589 F. App'x 35, 36 (2d Cir. 2015) ("In evaluating whether the requisite substantial evidence exists, we 'defer to the Commissioner's resolution of conflicting evidence.'" (quoting *Cage*, 692 F.3d at 122)); *see also Kathleen D. v. Comm'r of Soc. Sec.*

*Admin.*, No. 20-cv-01374, 2022 WL 354553, at *7, 2022 U.S. Dist. LEXIS 21128, at *16-17 (D. Conn. Feb. 7, 2022) (rejecting the plaintiff's argument that there was evidence demonstrating that her treating physician's opinion—which the ALJ found unpersuasive—was consistent with the record, where physical examination findings from an office visit less than two weeks before he wrote his opinion were normal (citing *Gentile v. Saul*, No. 19-cv-01479, 2020 WL 5757656, at *12, 2020 U.S. Dist. LEXIS 177822, at *4–5 (D. Conn. Sept. 28, 2020))). Thus, the Court finds that the ALJ's conclusion that the Miller/Saini Opinion's exertional restrictions are not "very persuasive" is supported by substantial evidence.

The ALJ's conclusion that the Miller/Saini Opinion's mental limitations are not "very persuasive" because they are not supported by objective evidence and are inconsistent with their own progress notes, is also supported by substantial evidence. (*See* R. 18 (citing R. 1078 ("Psych: Mood/Affect: Affect is normal."), 1307 (same), 1312 (same), 1304 ("He states his depression is better."))). PA Miller and Dr. Saini opined that Plaintiff was "unable to meet competitive standards" in "[c]arry[ing] out very short and simple instructions," "[m]ak[ing] simple work-related decisions," "[a]ccept[ing] instructions and respond[ing] appropriately to criticism from supervisors," and "[d]eal[ing] with normal work stress." (R. 1133). However, PA Miller and Dr. Saini's progress notes offer no *objective* findings supporting these conclusions, and their treatment records belie them: again, Plaintiff's mental examinations were routinely normal, (R. 435, 1078, 1084, 1089, 1093, 1100, 1104, 1110, 1125, 1306–07, 1311–12), as were mental status examinations performed at Pulmonary Health Physicians and by Dr. Grassl, (R. 616–17, 407, 970, 975, 1187). Other medical evidence in the record indicating that his depression was improved, (R. 1076, 1082, 1087), and that his mood disorder was often mild with no intensification of symptoms, (R. 1060–75, 1291–1303), also contradict the mental limitations

identified in the Miller/Saini Opinion. Thus, the ALJ's conclusion that the restrictive mental restrictions identified in the Miller/Saini Opinion were not "very persuasive" is supported by substantial evidence.

The Court finds that the ALJ adequately addressed supportability and consistency, and, contrary to Plaintiff's argument, that the ALJ's "lumping" together her analysis of the medical provider opinions, has not prevented the Court from reviewing the path of the ALJ's reasoning. (Dkt. No. 15, at 18–19); *Revisions to Rules*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5858 ("We expect that the articulation requirements in these final rules will allow a . . . reviewing court to trace the path of an adjudicator's reasoning.").

In sum, the Court finds that substantial evidence supports the ALJ's evaluation of the Miller/Saini opinion.

### 2.    Foresti Opinion

Plaintiff asserts that the ALJ also erred in finding the Foresti Opinion to be not "very persuasive," arguing that: 1) the ALJ failed to explain how she considered the supportability and consistency factors in her evaluation of the Foresti Opinion; 2) that Foresti's reliance on Plaintiff's subjective self-reports "is not a valid basis for rejecting his opinion"; and 3) the evidence in the record is consistent with the Foresti Opinion. (Dkt. No. 15, at 23–24). Defendant responds that the ALJ adequately considered Foresti's opinion. (Dkt. No. 20, at 15).

The Court finds that the ALJ properly explained how she applied the supportability and consistency factors in her consideration of the Foresti Opinion, and that substantial evidence supports her conclusion.[12] The ALJ found Foresti's opinion less persuasive because it was based

---

[12] As a licensed clinical social worker, Foresti is not an "acceptable medical source" within the meaning of the regulations. 20 C.F.R. § 404.1513(a); *see Rivas v. Berryhill*, No. 17-cv-05143, 2018 WL 4666076, at *10, n.6, 2018 U.S. Dist. LEXIS 168012, at *29 n.6 (S.D.N.Y. Sept. 27, 2018) (explaining that social workers are not considered acceptable medical sources even under the new regulations (citing 20 C.F.R. § 404.1502(a))). However, as a licensed

33

on Plaintiff's subjective self-reports, noting that "a review of LCSW-R Foresti's progress notes show merely a recitation of the claimant's subjective complaints, as opposed to any objective findings," and that his conclusion that Plaintiff "would be off task more than 20% of the day and absent from work more than four days per month is speculative and not based on any objective findings." (R. 18–19). Contrary to Plaintiff's argument, the ALJ validly considered Foresti's reliance on Plaintiff's subjective complaints as part of her supportability analysis. (Dkt. No. 15, at 23). "The supportability analysis focuses on 'how well a medical source supported their opinion(s) with *objective* medical evidence and supporting explanations.'" *Kathleen A. v. Comm'r of the Soc. Sec. Admin.*, No. 20-cv-1034, 2022 WL 673824, at *4, 2022 U.S. Dist. LEXIS 29926, at *11 (N.D.N.Y. Mar. 7, 2022) (emphasis added) (quoting *Carmen M. v. Comm'r of the Soc. Sec. Admin.*, No. 20-cv-06532, 2021 WL 5410550, at *4, 2021 U.S. Dist. LEXIS 223435, at *12 (W.D.N.Y. Nov. 19, 2021)). Here, the ALJ explained that she had reviewed Foresti's progress notes and found they showed "merely a recitation of the claimant's subjective complaints, as opposed to any objective findings." (R. 18). Indeed, Foresti's progress notes are sparse, frequently identical except for the date, and contain, at most, a sentence or two reflecting Plaintiff's current concerns. (*See, e.g.*, R. 1024 ("Anxiety and depressed mood, reports denied SSDI again.")). Moreover, Foresti's reliance on Plaintiff's self-reports was not the only element of the ALJ's supportability analysis. The ALJ also noted that Foresti indicated that "his opinion [was] based in part on the claimant's physical impairments" and found that this was

---

social worker "working within the scope of practice permitted under State . . . law," Foresti is a "medical source," 20 C.F.R. § 416.902(i), and under the new regulations, adjudicators are required to "articulate how they consider medical opinions from all medical sources, regardless of whether or not the medical source is an A[cceptable] M[edical] S[ource]." *Revisions to Rules*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844; *see also Kimberly W. v. Kijakazi*, No. 20-cv-925, 2022 WL 561665, at *3–4, 2022 U.S. Dist. LEXIS 32835, at *9 (N.D.N.Y. Feb. 24, 2022) (noting, in a claim under the new regulations, that an LCSW was not an acceptable medical source, but as a "licensed healthcare worker working within her scope of practice, she is considered a medical source rather than a nonmedical source" (citing 20 C.F.R. § 416.902(i), (j))).

"beyond the scope of his treating relationship with the claimant." (R. 18 (citing R. 621)). Because Foresti's specialization as a social worker providing therapy was an appropriate factor for the ALJ to consider, *see* 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c), Plaintiff's argument is without merit.

Plaintiff argues that the Foresti Opinion was based, in part on objective evidence, citing Foresti's observation in one progress note that when he assisted Plaintiff in completing a housing application, Plaintiff appeared "to have difficulty with reading comprehension and concentration." (Dkt. No. 15, at 23 (citing R. 1073)). But this sole objective finding is insufficient to support Foresti's opinion that Plaintiff was "seriously limited but not precluded" in his ability to, among other things, perform at a consistent pace, deal with normal work stress, and interact with the general public or that Plaintiff would be off-task more than 20 percent of the day or absent more than four days per month. (R. 622–23). Foresti's progress notes contain no objective findings that would support these restrictions. (*See, e.g.*, R. 1040–45 (Plaintiff's anxiety and depression were a 3–4/10), 1072 (Plaintiff's cognitive dysfunction was "mild" with "poor concentration"), 1291–1303 (Plaintiff's mood disorder was mild)).

Plaintiff also argues that the ALJ failed to consider that the Foresti Opinion was consistent with the Miller/Saini Opinion, a "PHQ-9 test" score of 20–27 "indicating severe depression," (Dkt. No. 15, at 24 (citing R. 662 (August 4, 2017 progress note from New York Spine and Wellness))), and a note in a pulmonology record that "Plaintiff had been hospitalized after a suicide attempt," (*id.* (citing R. 968)). In this case, the ALJ expressly recognized there was some evidence consistent with mental limitations in the record, including that: 1) Foresti, PA Miller, and Dr. Saini all identified "significant mental restrictions," and more specifically, that they all opined that Plaintiff "would be off task more than 20% of the day and absent from work

more than four days per month," (R. 19); 2) that Foresti noted Plaintiff's depressed and anxious

appearance, (R. 21); and 3) that there were reports of Plaintiff's stress, (*id.*). However, the ALJ

explained that such evidence was contradicted by the evidence of multiple normal mental status

exams reflected in Plaintiff's pulmonology, pain management, and hospital records and progress

notes, (R. 19 (citing R. 1078, 1289, 1307, 1312), 21 (citing R. 406 (pulmonary records finding

"normal" thought content and perception, "no impairment of attention, no impairment of

concentration," alert and oriented, and normal mood and affect), 1100 (PA Miller noting Plaintiff

was "alert and oriented x3" and that "affect is normal"))), Dr. Grassl's description of Plaintiff's

cooperativeness and adequate manner of relating, (R. 19 (citing R. 616)), and Plaintiff's own

statements concerning his volunteer work and move to his new apartment, (R. 19). The ALJ did

not specifically cite the PHQ-9 test score, or Plaintiff's prior hospitalization, which predates the

relevant time period, but the ALJ need not "explicitly reconcile every conflicting shred of

medical testimony" in her decision. *Miles*, 645 F.2d at 124. Thus, the ALJ adequately explained

consistency. *See* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) ("The more consistent a medical

opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the

claim, the more persuasive the medical opinion(s) . . . will be."); *Platt v. Comm'r of Soc. Sec.*,

No. 20-cv-8382, 2022 WL 621974, at *7, 2022 U.S. Dist. LEXIS 37762, at *17–18 (S.D.N.Y.

Mar. 3, 2022) (finding that the ALJ complied with the new regulations in terms of evaluating the

supportability and consistency factors when she articulated the inconsistencies between the

doctor's opinion and the claimant's function report as well as the claimant's own statements).

   The ALJ's consideration of the consistency factor is also supported by substantial

evidence. As the ALJ explained, the mental restrictions, including those identified by Foresti, are

belied by Plaintiff's frequently normal psychiatric examinations, (R. 435, 1078, 1084, 1089,

1093, 1100, 1104, 1110, 1125, 1306–07, 1311–12), Foresti's own progress notes, which often characterize Plaintiff's depression as mild, (R. 1060–75, 1291–1303), progress notes from Northway describing Plaintiff's depression as "okay" and "better," (R. 1080, 1304), Dr. Grassl's report, (R. 61–19), and Plaintiff's reports that he finds joy in volunteering, and was more social at his new apartment, (R. 504, 616, 1040–41).[13]

In sum, Plaintiff's argument that the ALJ improperly explained the supportability and consistency factors as to the Foresti Opinion is without merit, and the Court finds that substantial evidence supports the ALJ's weighing of the Foresti opinion.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>March 14, 2022</u>
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[13] The parties have not discussed the propriety of the ALJ's citation to Plaintiff's regular attendance at AA meetings and sobriety for over two years as support that he could "keep a schedule," after discounting the opinions of PA Miller, Dr. Saini, and Foresti that Plaintiff would be off task more than 20% of the day and absent from work more than four days a month. *See Davila v. Comm'r of Soc. Sec.*, No. 17-cv-6013, 2019 WL 1244661, at *11, 2019 U.S. Dist. LEXIS 43960, at *27 (S.D.N.Y. Mar. 18, 2019) (noting that plaintiff's attendance at therapy was a "poor reason" to discount the opinion of treating providers because "[t]here is plainly a difference between showing up at work each day and attending periodic therapy sessions"). However, any error here was harmless because, as discussed above, the ALJ also reasoned that the opinions regarding time off task and attendance were "speculative and not based on any objective findings." (R. 19). Indeed, neither the Miller/Saini Opinion nor the Foresti Opinion offer any objective findings to support their conclusions regarding attendance and time off task.